The Home Sales Company et al. [1] v. Commissioner. Home Sales Co. v. Commissioner
Docket Nos. 55126-55128.
United States Tax Court
T.C. Memo 1957-78; 1957 Tax Ct. Memo LEXIS 171; 16 T.C.M. (CCH) 341; T.C.M. (RIA) 57078; May 17, 1957
*171 1. Respondent disallowed certain alleged compensation deductions in part and others in their entirety. The compensation deductions claimed by the corporate petitioners, home construction companies, were charged on the books as compensation for Theodore, who, with his wife, owned all of the stock of the corporate petitioners, and for his two sons, Carl and Edward. Held, that compensation claimed for Theodore allowed in full and compensation claimed for Carl and Edward allowed in part. 2. Theodore incurred out-of-pocket expenses on behalf of corporate petitioners. He estimated the amounts expended and corporate petitioners reimbursed him. Corporate petitioners deducted the amounts as ordinary and necessary business expenses. Respondent disallowed the claimed deductions on the ground of insubstantiation. Held, amounts expended and deductible determined under the Cohan rule. 3. Amount received by Theodore in excess of amount determined to have been expended by him for corporate expenses determined to be income under section 22(a), Internal Revenue Code of 1939. 4. Additions to the tax under section 294 (d)(1)(A) and section 294(d)(2) of the 1939 Code are predicated on the tax as finally *172 determined (the tax imposed by chapter 1) rather than the tax as shown on the return. Harry L. Brown, Esq., World Center Building, Washington, D.C., and Sidney London, Esq., for the petitioners. Harold Weinstock, Esq., for the respondent. BLACK
Memorandum Findings of Fact and Opinion The respondent has determined deficiencies, as follows: Docket No. 55126 - The Home Sales Company
Year Ended
Tax
Deficiency
June 30, 1950
Income
$14,397.49
June 30, 1951
Income and Excess
Profits
27,561.50
Docket No. 55127 - The Home Sales
Company "A"
Taxable period
November 1,
1950 to May
Income and Excess
31, 1951
Profits
2,728.50
Docket No. 55128 - Theodore and Anna Julio
December 31,
1950
Income
1,567.00 Additions to the tax of Theodore and Anna Julio for 1950 under section 294(d)(1)(A), Internal Revenue Code of 1939, [2] in the amount of $1,401.77, and under section 294 (d)(2) in the amount of $514.51, have also been determined. These proceedings have been consolidated. Not all of the adjustments that have been made by the respondent are in issue. The adjustments which are in issue are: (1) The partial disallowance of certain claimed compensation *173 payments and the entire disallowance of other claimed compensation payments made by Home Sales Company and Home Sales Company "A" to Theodore Julio, who, with his wife owned all of the stock of these corporations, and to Carl and Edward Julio, sons of the sole stockholders; (2) the partial disallowance of certain alleged corporate business expenses which were paid by Theodore Julio and for which he was reimbursed by Home Sales Company and Home Sales Company "A"; (3) the inclusion in the income of Theodore Julio of the amount paid to him by Home Sales Company in 1950 as alleged reimbursement for corporate expenses; and (4) the determination of additions to the tax of Theodore and Anna Julio. Findings of Fact A stipulation of facts has been filed and is incorporated herein by reference. General and Issue 1: Compensation Petitioner, The Home Sales Company, (hereinafter sometimes referred to as Home Sales) is a corporation organized under the laws of the State of Maryland in October 1948, and its principal office is located at 3024 Spaulding Avenue, Baltimore. Its capital is in the amount of $500, for which five shares of common stock were issued, three shares being held by Theodore Julio *174 and two shares by Anna Julio. The corporation commenced active operation in July 1949. Petitioner, The Home Sales Company "A", (hereinafter sometimes referred to as Home Sales "A") is a corporation organized under the laws of the State of Maryland on November 1, 1950, and its principal office is located at 3024 Spaulding Avenue, Baltimore. Its capital is in the amount of $300, and is represented by three shares of common capital stock, two shares of which are held by Theodore Julio and one share by Anna Julio. Home Sales and Home Sales "A" will sometimes hereinafter be referred to as corporate petitioners. During the years here involved Home Sales and Home Sales "A" maintained their books and reported their income on an accrual method of accounting. They filed their income tax returns with the collector of internal revenue for the district of Maryland. Petitioners, Theodore and Anna Julio, husband and wife, hereinafter referred to as Theodore and Anna, respectively, have a business address at 3024 Spaulding Avenue, Baltimore, and filed their income tax return with the collector of internal revenue for the district of Maryland. Carl Julio, hereinafter referred to as Carl, and Edward *175 Julio, hereinafter referred to as Edward, are the sons of Theodore and Anna. Theodore was the president of Home Sales and Home Sales "A". Anna was vice president of such companies. Carl was treasurer of Home Sales but was not authorized to sign checks. Edward was not an officer of either company. The business of Home Sales and Home Sales "A" was the construction of homes for sale in Baltimore. Theodore and his family corporations were considered one of the largest builders in the area. The number of housing units completed and sold each year was as follows: Home Sales
Year Ended
Number of Units
June 30
Built and Sold
1950
106
1951
131
Home Sales "A"
Period Ended
May 31
1951
11 The houses built were low cost row house units which, including the land, sold for approximately $7,500 each. The following schedules show the amounts that were accrued or charged on the books of Home Sales as compensation for the fiscal years ended June 30, 1950 and June 30, 1951,[3] the amounts that were accrued or charged on the books of Home Sales "A" [4] for the fiscal period ended May 31, 1951, and the amounts disallowed and allowed by the respondent in his notice of deficiency: Petitioners
Accrued or
Respondent
Charged on Books
Disallowed
Allowed
Home Sales - Fiscal Year Ended
June 30, 1950
Theodore
$31,636.90 [1]
$11,636.90
$20,000
Carl
28,757.30 [2]
16,757.30
12,000
Edward
10,420.70 [3]
4,420.70
6,000
Totals
$70,814.90
$32,814.90
$38,000
Home Sales - Fiscal Year Ended
June 30, 1951
Theodore
$31,636.90
$11,636.90
$20,000
Carl
27,757.30
15,757.30
12,000
Edward
11,350.00
5,350.00
6,000
Totals
$70,744.20
$32,744.20
$38,000
Home Sales "A" - Fiscal Period
Ended May 31, 1951
Theodore
$ 4,500.00
$ 2,000.00
$ 2,500
Carl
2,600.00
2,600.00
Edward
1,375.00
1,375.00
Totals
$ 8,475.00
$ 5,975.00
$ 2,500
*176 The amounts in the above schedules, after reductions for withholding taxes and other payroll deductions, were paid as follows: Home Sales - Fiscal Year Ended June 30, 1950
Theodore
10 weekly payments during F. Y. at approx. $100
$ 1,006.00
43 weekly payments during F. Y. at approx. $300
12,901.90
Bonus September 14, 1950
17,500.00
Total
$31,407.90
Carl
10 weekly payments during F. Y. at $65
$ 650.00
44 weekly payments during F. Y. at approx. $300
13,201.30
Bonus September 14, 1950
14,500.00
Total
$28,351.30
Edward
28 weekly payments during F. Y. at amounts ranging from $10
to $60
$ 847.95
21 weekly payments during F. Y. at approx. $75
1,574.75
Bonus September 14, 1950
8,000.00
Total
$10,422.70
Home Sales - Fiscal Year Ended June 30, 1951
Theodore
10 weekly payments during F. Y. at $300
$ 3,000.00
Payment December 16, 1950
10,000.00
Payment December 19, 1950
5,000.00
Bonus September 14, 1951
13,636.90
Total
$31,636.90
Carl
10 weekly payments during F. Y. at $300
$ 3,000.00
Payment December 16, 1950
7,500.00
Payment May 16, 1951
600.00
Bonus September 14, 1951
16,657.30
Total
$27,757.30
Edward
3 weekly payments during F. Y. at $75
$ 225.00
7 weekly payments during F. Y. at $125
875.00
Payment December 16, 1950
7,500.00
Payment December 19, 1950
2,500.00
Payment May 16, 1951
250.00
Total
$11,350.00
Home Sales "A" - Fiscal Period Ended May 31, 1951
Theodore
Bonus August 14, 1951
$ 4,500
Carl
7 weekly payments during fiscal period at $300
$ 2,100
Bonus August 14, 1951
500
Total
$ 2,600
Edward
7 weekly payments during fiscal period at $125
$ 875
Bonus August 14, 1951
500
Total
$ 1,375
*177 No written agreement was entered into between the corporate petitioners and the Julios as to the amount of compensation which was to be paid to them. Moreover, there was no formal authorization by petitioners' directors of the amounts paid. Theodore and Carl agreed early in the fiscal year ended June 30, 1950, that they would draw $300 weekly from Home Sales. At the end of that year they analyzed what they had done and agreed on bonuses and total compensation. They also determined Edward's compensation, including bonus. The compensation for the fiscal year ended June 30, 1951, was predicated on the compensation for the prior year. The amounts paid by Home Sales "A" to Theodore, Carl, and Edward were paid without any discussion. The sales, net income before deduction of the salaries paid to the Julio family, the amount of such salaries deducted, and the net income after the deduction of such salaries for Home Sales and Home Sales "A" for the periods involved herein are as follows: Home Sales
Home Sales "A"
Fiscal Year
Fiscal Year
Fiscal Period
Ended
Ended
Ended
6/30/50
%
6/30/51
%
5/31/51
%
Sales
$797,030
100
$998,520
100
$87,900
100
Net income before Julios' compensation
$137,657
17.3
$120,464
12.1
$18,968
21.6
Julios' compensation: Theodore
$ 31,637
4
$ 31,637
3.2
$ 4,500
5.1
Carl
28,757
3.6
27,757
2.8
2,600
3
Edward
10,421
1.3
11,350
1.1
1,375
1.5
Anna
2,150
.3
2,150
.2
$ 72,965
9.2
$ 72,894
7.3
$ 8,475
9.6
Net income after deductions of above
compensation
$ 64,692
8.1
$ 47,570
4.8
$10,493
12.0
*178 During the periods involved neither Home Sales nor Home Sales "A" declared or paid any formal dividends. During its fiscal years ended June 30, 1950 and June 30, 1951, Home Sales neither accrued nor paid any compensation to persons other than Theodore, Carl, Edward, and Anna for services other than clerical, mechanical, or general labor. In 1950, Theodore was 49 years old. He was born in Italy and came to this country at the age of 22. His formal education consisted of attending school to the fourth grade. Thereafter, while in Italy, he worked with and learned the stone masonry trade from his father. When Theodore came to this country in 1923, he worked for about 3 years as a stone mason employee. For the next 10 years he subcontracted masonry work. In about 1938 or 1939, he started to build and sell homes for himself. Prior to June 30, 1949, Theodore, by reason of his previous experience, was familiar with the problems involved in the purchase of land, its subdivision, and the construction, on a large scale, and sale of homes thereon. He was also familiar with the problems involved in arranging Government guaranty for the financing of such construction and the arranging for all financing *179 through various banks. In March 1949, Theodore was convicted in the United States District Court for the District of Maryland on three counts of having constructed homes in such a manner as to be in violation of priorities regulation 33 of the Civilian Production Administration and of the Veterans Emergency Housing Act of 1946, and on three other counts of having made false and fraudulent statements and representations to an agency of the United States in violation of Title 18, United States Code, section 80. He was fined $2,500 and sentenced to 3 months, which were served at the Federal Reformatory at Petersburg, Virginia, from March 4 to June 3, 1949. Notwithstanding this, his reputation as a builder in the Baltimore area remained good. With knowledge of such, the board of directors of the Loyola Federal Savings Association, in Baltimore, approved lending to the Home Sales Company, $1,000,000. Carl was born in November 1929. He was graduated from the Baltimore Polytechnic High School in February 1948. In that school he studied engineering subjects. From the age of 12 to 14, he attended the Maryland Institute on Saturday mornings, studying mechanical drawing. When he started in high *180 school at 14, he also attended the Maryland Institute 3 nights a week for 2 hours a night during the same 4 years. There he studied architectural drawing, mechanical drawing, and other subjects dealing with the construction business. Edward was born in August 1931. After having attended City College High School in Baltimore, as well as the Maryland Institute at nights, he quit school in June 1949, and started working full time with his father. As his father had done with him, Theodore started to train his sons, Carl and Edward, in the building business at an early age. Even at the age of 9, Theodore would take Carl along with him on jobs and on business calls. At the age of 12, he also went to his father's construction jobs by streetcar after school and did such simple work as cleaning up debris, breaking stones, putting hardware on windows and doors, and installing medicine cabinets. At the age of 13, during the summer vacation months, his father, having completed one project and started on another some distance away, Carl stayed at the completed homes to show prospective customers the premises. Edward worked for his father since he could remember. He also had worked after school, *181 Saturdays, and Sundays, and during summer vacations. Theodore, as president of Home Sales, was the "general manager" of its building projects. His services, in addition to those as president of the corporation, consisted of analyzing the land acquired, assisting with the preliminary subdivision plans, obtaining approval from local authorities of such plans, purchasing construction materials, handling bank financing and working with the Federal Housing Administration, hereinafter referred to as F.H.A., and the Veterans Administration, hereinafter referred to as V.A., and acting as construction superintendent. He also acted as a sales agent for the homes built. Carl, for Home Sales, assisted in analyzing the land acquired, assisted in drawing the preliminary subdivision plans, worked with the local authorities in obtaining approval for the use of such plans, worked with his father on financing problems, drew the building plans and specifications, purchased building materials, assisted in the supervision of a very substantial land moving operation necessary to the project, supervised labor, acted as construction superintendent, and otherwise generally assisted his father. He also acted *182 as a sales agent for the homes constructed. Edward's activity for Home Sales consisted primarily of supervising construction, which included the supervision of subcontract labor. While he did some construction material purchasing, this was principally "on the job buying." His labor supervision included the quarter of a million cubic yard earth moving operation involved in connection with the building projects. With his father and brother, he assisted in selling the homes built. He also received and checked materials arriving on the job which, in peak periods, ran as high as $30,000 or $40,000 a week. Theodore, Carl, and Edward spent long hours on the job and also worked on weekends. The corporate petitioners subcontracted the following work: excavating, concrete work, carpentry, bricklaying, studding, roofing, plumbing, heating, electrical, lathing and plastering, paper hanging, and sodding. The subcontractors were carefully selected by petitioners on the basis of their experience, reliability, honesty, and carefulness of their workmanship. If the work of any subcontractor's employees was not satisfactory, the petitioners could ask the subcontractor to replace him (them) or the unsatisfactory *183 worker could be ordered off of the job by the petitioners. The standard schedule of real estate commissions specified by the Real Estate Board of Baltimore for its members during the years 1949, 1950, and 1951, was 5 per cent on an improved parcel of residential real estate up to a selling price of $25,000, and 3 per cent on any balance, with the exception that its members had the right to sell for a bona fide home builder at a rate of from one-half to the full rate for such property. The V.A., in approving the value of a house for G.I. financing purposes, generally did not allow the builder any amount for selling commissions. If such an expense was incurred, it had to be absorbed out of the 5 per cent added to the reproduction cost for office overhead. In the very few instances where a sales commission was specifically allowed it never exceeded 2 1/2 per cent of the sales price of the house. There was a shortage of, and a demand for, low cost homes in the Baltimore area during the period June 30, 1949 to June 30, 1951. During the fiscal period ended May 31, 1951, Home Sales "A" paid no house selling commissions. Both Carl and Edward deposited most of the amounts received from the *184 corporate petitioners in various bank accounts which they each had jointly with their mother. Except for certain withdrawals which were made to pay the individual income tax liabilities of Carl and Edward, substantially all of the deposits made by them during the years herein involved were paid over to Theodore as loans or, in one instance, to Anna, who used the amounts to purchase life insurance on Theodore's life, with herself as beneficiary. Amounts loaned to Theodore by Carl and Edward from their salary (except at least $967.89 repaid on March 15, 1951) have not yet been repaid. Notes evidencing the obligation of Theodore to repay, however, were given to his sons and an agreed arrangement for repayment was effected in March 1953 by the acquisition by Theodore of certain unimproved land to be used by Carl and Edward for building purposes. The record does not indicate whether Anna has ever repaid the amounts she withdrew. Carl was on active duty as an enlisted man in the Navy from January 1951 to June 1953. By the time he left he held the rank of draftsman third class. The first 9 weeks of his service consisted of basic training in Rhode Island. After basic training, he was stationed *185 in Norfolk, Virginia, and was able to go home and work most weekends. Edward was on active duty as an enlisted man in the Air Force from February 1951 to November 1954. His rating was airman first class. He was stationed in Geneva, New York, which is approximately 350 miles from Baltimore. When Carl and Edward were in the service the only additional person hired to replace them was a carpenter who acted as a sort of foreman and who was paid $150 per week. In addition to the 237 houses built and sold by Home Sales during the fiscal years here involved, approximately 160 other homes were subsequently completed on the same project and sold. A part of the 160 other homes was under construction on June 30, 1951. The record does not show the period involved in completing and selling the 160 other homes. During part or all of the period July 1, 1949 to June 30, 1951, Theodore, in addition to his interests in the corporate petitioners, had substantial interests in the following companies which were engaged, had engaged, or were planning to engage, in the building business: Parkway Development Company (hereinafter sometimes referred to as Parkway), West Bay Construction Company, Julio Brothers, *186 C. J. Construction Company, Chinquapin, Inc., Home Sales "B", Home Sales "C", and Home Sales "D". Parkway, during its fiscal year ended June 30, 1950, had gross receipts of $681,606.20 from the sale of houses. All of the homes sold by Parkway between July 1, 1949 and June 30, 1950, were constructed before July 1, 1949, and were rented. The operation was managed by a third party. During the fiscal year ended June 30, 1951, it sold the one home that it had remaining at the beginning of the year and was liquidated. On Parkway's income tax returns for the fiscal years ended June 30, 1950 and June 30, 1951, it is stated that Theodore devoted 50 per cent of his time to that company's affairs. During the calendar year 1949, Theodore received the following compensation from family-owned corporations other than petitioners: West Bay Construction Com-
pany
$ 1,300.00
C. J. Construction Company
13,489.08
Parkway Development Com-
pany
24,124.20
$38,913.28 A substantial portion of these amounts was earned prior to July 1, 1949. During the period covering the calendar year 1948 and the first 6 months of 1949, Carl received the following amounts of compensation from other family businesses: Amount of
Period
Compensation
Family Business
Year Ended 12/31/48
$2,482.00
Parkway Development Company
6 Months Ended 6/30/49
891.50
C. J. Construction Company
57.10
Parkway Development Company
During *187 the first 6 months of 1949, Edward received a total of $274.70 for his services, $241.70 from the C. J. Construction Company and $33 from Parkway. Neither Carl nor Edward, prior to the years involved herein, worked for anyone other than the businesses run by their family. Carl, during the period herein involved, did not work full time for Home Sales and Home Sales "A". He was employed by Home Sales "B" as its president, and received a salary of $8,400 in 1951. This amount was for the services which he rendered prior to January 1951, when he entered the Navy. He also performed similar services at the same time for Home Sales "C", for which he received, in 1951, a salary of $2,400. Likewise, Edward, during the period involved herein, did not work full time for Home Sales and Home Sales "A". Prior to entering the Air Force in February 1951, he performed services for Home Sales "B" and Home Sales "C", for which he received, in 1951, $3,604.15 and $1,000 respectively. Reasonable compensation for services actually rendered is as follows: Home Sales
Home Sales
"A"
Fiscal
Fiscal
Fiscal
Year
Year
Period
Ended
Ended
Ended
6/30/50
6/30/51
5/31/51
Theodore
$31,636.90
$31,636.90
$4,500.00
Carl
15,000.00
12,000.00
1,000.00
Edward
8,000.00
6,000.00
500.00
Issue *188 2 Business Expenses Home Sales, on its Federal income tax returns for the fiscal years ended June 30, 1950, and June 30, 1951, deducted $5,094.56 and $6,090.63, respectively, for travel, entertainment, and miscellaneous expenses. The respondent disallowed $4,500 of each of these amounts. The disallowed amount for the year ended June 30, 1950, was paid by Home Sales to Theodore in one lump sum on September 14, 1950. The disallowed amount for the year ended June 30, 1951, was credited after the close of the fiscal year to the loans account owed to Home Sales by Theodore. Home Sales "A", on its Federal income tax return for the fiscal period ended May 31, 1951, deducted $984.63 as sales expense. The respondent disallowed $500 of this amount. This disallowed amount was credited after the close of the fiscal period to the loans account owed by Home Sales "A" to Theodore. Theodore had no receipts, and no books or other records were produced in substantiation of these alleged expenses. The amounts of $4,500 deducted in each of its fiscal years by Home Sales and the amount of $500 deducted by Home Sales "A" were estimates of expenses which Theodore testified he thought he had incurred on *189 behalf of the corporate petitioners. During the taxable periods here involved, Theodore made out-of-town trips for the purpose of buying building supplies for Home Sales and Home Sales "A". These included trips to Virginia; to York, Red Lion, Oxford, and Philadelphia, Pennsylvania; to Hagerstown, Maryland; and to New York. On these trips he was often accompanied by Carl. The expenses were paid by Theodore from his own pocket. In the course of the corporate business of each corporation, Theodore and Carl drove company cars. They sometimes incurred expense for parking in downtown Baltimore while on corporate business; this was paid by Theodore. On the two construction jobs pay telephone stations were maintained for the operation of the business; Theodore would pay for calls out of his pocket. At Christmas time, in the period here involved, Theodore purchased a quantity of liquor which was given to the various laborers, subcontractors, salesmen, and telephone, gas, and electric company employees. In the selling work performed by Theodore, Carl, and Edward, it was sometimes necessary that they remain on the job in the evenings and on Sundays. When they did remain on the job, they would *190 dine at a nearby restaurant and Theodore would pay for the meals. Theodore paid $1,000 on behalf of Home Sales for items representing ordinary and necessary business expenses incurred in the business of Home Sales in each of the years involved herein. Theodore paid $150 on behalf of Home Sales "A" for items representing ordinary and necessary business expenses incurred in the business of Home Sales "A" in the fiscal period ended May 31, 1951. The reimbursements by Home Sales to the extent of $1,000 in each year and Home Sales "A" to the extent of $150. constituted ordinary and necessary business expenses incurred in trade or business. Issue 3 The amount of $3,500 of the $4,500 paid to Theodore by Home Sales in the calendar year 1950 as alleged reimbursement for out-of-pocket expenses did not constitute a reimbursement for expenses. The $3,500 was income to Theodore and Anna. Issue 4: Aditions to the Tax (No evidence regarding this issue has been introduced and no findings will be made.) Opinion Issue 1: Compensation BLACK, Judge: The first question is whether certain alleged compensation payments, deducted by Home Sales and Home Sales "A", are not deductible to the extent determined *191 and disallowed by the Commissioner. Section 23(a)(1)(A) allows as deductions from gross income "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." (Italics added.) Whether the amounts deducted are reasonable is a question of fact. Each case must be decided on its own peculiar circumstances. No single factor or circumstance is controlling, but certain factors have been considered relevant. Cf. Miller Mfg. Co. v. Commissioner, (C.A. 4, 1945) 149 Fed. (2d) 421, affirming Memorandum Opinion of the Tax Court. In the Miller Mfg. Co. case the court said: "A determination by the Commissioner of a reasonable allowance for compensation, in a specific case, carries a clear presumption of correctness and places upon the taxpayer the burden of proving that it is entitled to a deduction larger than that determined by the Commissioner. * * *" [Citing authorities.] Where the alleged compensation is paid to stockholders of a family corporation or to members of the family, the circumstances suggest that the alleged compensation *192 may, in fact, be disguised distributions of profit. Cf. Miles-Conley Co. v. Commissioner, (C.A. 4, 1949) 173 Fed. (2d) 958, 960; Fifteenth & Chestnut Realty Co., (1934) 29 B.T.A. 1030, 1032. In the instant case, both the corporate petitioners are wholly owned by Theodore and his wife, Anna. In addition, they owned several other corporations, some of which were active during the periods in question. The deductions in question are those claimed as compensation for Theodore and his sons, Carl and Edward. Theodore was about 50 years of age during the years in question and, although he had little formal education, he was an experienced and successful builder of houses. Carl was 19 to 21 years old during the periods in question and Edward was about 2 years younger than Carl. Theodore, as his father had done with him, tried to teach the boys the construction business from the time they were young. Except for one person who was hired after Carl and Edward entered the armed services, the Julios performed all of the executive, administrative, sales, and supervisory work of the corporate petitioners. On their housing projects, they would purchase a tract of undeveloped land; subdivide it; *193 excavate, fill, and grade the land; lay foundations; erect the homes; and sell them. Carl performed the architectural services for the corporate petitioners. Theodore was the general manager and, with the assistance of Carl, took care of the arrangements with the lending agencies and Federal authorities, purchased the materials, negotiated with subcontractors who performed a substantial amount of the work, supervised the building of the houses, and handled the sales. Edward principally worked at the construction site, supervising labor, checking materials, and helping with the sales. All three worked long hours and on weekends. Carl entered the Navy in January 1951, but did some weekend work after he finished boot training. Edward entered the Air Force in February 1951. The corporate petitioners built and sold, during the fiscal years in question, 248 houses; the sales price was about $1,883,450; they had a net profit before salaries for the Julio family of about $277,100; charged $154,334 as compensation for the Julios; and had a net profit of $122,756. The combined net profit for the periods involved herein, before the Julios' compensation, was 14.7 per cent; the Julios' compensation *194 was 8.2 per cent; after the Julios' salaries, the net profit was 6.5 per cent. No formal dividends were declared or paid during the periods involved herein. Only a part of their total compensation was paid in periodic payments. The bonuses, which consisted of substantial portions of the alleged compensation, were paid about 2 1/2 months after the close of the fiscal years. The total amounts of the bonuses were not agreed upon until the end of the year. It appears that the corporate petitioners were continually short of cash and that Theodore borrowed cash from Carl and Edward and loaned it to the corporations. We have found that the amounts claimed by the corporate petitioners as compensation for Theodore were reasonable compensation for services rendered and are deductible under section 23(a)(1)(A). This finding, we think, is justified by a record which speaks with clarity of the services actually rendered by Theodore to the corporate petitioners. His ability to continue operations successfully after his sons left for the armed services is a strong indication of the important role he played in the corporate petitioners' affairs. The fact that returns of Parkway Development Company *195 stated that he spent 50 per cent of his time with the affairs of that company is not of great importance in view of the fact that the construction of its housing project was complete prior to the periods in question and was being managed by a third party. On the other hand, we do not think that the corporate petitioners have established that the amounts claimed as compensation for Carl and Edward were reasonable compensation for the services which they rendered. The comparatively small amounts they received in prior years from other corporations of the family group, their ages during the periods involved herein, their prior experience, their sales activities, their compensation and work for other family corporations during the periods involved herein, and the period of time spent in the armed services during the periods involved herein, have all been considered in making our finding. Also of significance is the fact that after Carl and Edward went into the armed services Theodore was able to carry on the business of the corporations in a manner similar to the manner in which it was carried on when he had the assistance of his sons. After considering these factors, we have found that *196 reasonable compensation for services actually rendered was $15,000 and $12,000 for Carl from Home Sales for the fiscal years ended June 30, 1950 and June 30, 1951, respectively; $8,000 and $6,000 for Edward from Home Sales for the fiscal years ended June 30, 1950 and June 30, 1951, respectively; $1,000 for Carl and $500 for Edward from Home Sales "A". These findings should be given effect under Rule 50. Issue 2: Business Expenses Home Sales deducted the amount of $5,094.56 in the year ended June 30, 1950, and $6,090.63 in the year ended June 30, 1951, for travel, entertainment, and miscellaneous expense. The respondent disallowed $4,500 of each of these amounts. Home Sales "A" deducted the amount of $984.63 in the fiscal period ended May 31, 1951, as sales expense. Here, respondent disallowed $500 and allowed the balance. The disallowed amounts represented lump sum items which were in one instance paid to Theodore after the close of the fiscal year and in the other two instances credited to his account on the books of the corporate petitioners after the close of the fiscal years. Petitioners claim that these amounts were out-of-pocket payments made by Theodore on behalf of the corporate *197 petitioners and for which he was reimbursed by them after the close of the fiscal years. Neither the corporate petitioners nor Theodore kept any books or records or produced any receipts showing the nature or amounts of such alleged expenses. The amounts expended were estimated. Theodore testified that he incurred out-of-pocket expenses in regard to the following items: traveling out of town, meals when working evenings and Sundays, parking the automobile when downtown, making calls on the company's pay telephone, and making gifts of liquor to the company's employees, subcontractors, and others. Although he could not estimate the amount attributable to any of the individual items, he testified that he expended at least the amounts reimbursed by the corporate petitioners. We are convinced that Theodore did incur some out-of-pocket expenses on behalf of the corporate petitioners for which he was reimbursed. However, we do not think that the amounts claimed have been established. Since there is nothing in the record to indicate with any degree of clarity the amounts expended or the frequency of the expenditures, we have had to exercise our best judgment in making our Findings. In arriving *198 at our conclusions, we have considered that some of the out-of-town trips were not of great distance and were made in company automobiles, the estimated cost and quantity of the liquor, that the on-the-job telephones could be used by others, the cost of parking the company's automobiles, and the fact that there was no attempt to segregate the expenditures which may have been made on behalf of the various family corporations. Bearing heavily on the taxpayers whose inexactitude is of their own making, we have found that $1,000 of the $4,500 claimed in each year by Home Sales and $150 of the $500 claimed by Home Sales "A" are ordinary and necessary business expenses incurred in trade or business. Cohan v. Commissioner, (C.A. 2, 1930) 39 Fed. (2d) 540, 543-544. These Findings should be given effect under Rule 50. Issue 3 The respondent has added to the income of Theodore and Anna for 1950 the $4,500 which they received from Home Sales as reimbursement for out-of-pocket expenses that Theodore incurred on behalf of the corporation. See Issue 2, supra. In deciding Issue 2, we found that Theodore only expended $1,000, rather than $4,500, for corporate expenses. The difference of $3,500, *199 therefore, represents income to Theodore and Anna. Section 22(a). The amounts credited to Theodore by the corporate petitioners during their fiscal years 1951 are not involved in Issue 3. The deficiency determined against Theodore and Anna is for the year 1950 only. Issue 4: Additions to the Tax The respondent determined additions to the tax of Theodore and Anna for the calendar year 1950 under section 294(d)(1)(A) for failure to file a timely declaration of estimated tax, and also a further addition to the tax under section 294(d)(2) for substantially understating their estimated tax for that year. The computations of the additions were predicated on a finally determined tax (including deficiency). The burden of proof to show error on the part of the respondent in this regard is upon the petitioners. Harry Hartley, (1954) 23 T.C. 353, 360; William G. Lias, (1955) 24 T.C. 280, 322. Petitioners have not presented any evidence on these issues. Petitioners, however, argue that the respondent's determination of the additions to the tax are erroneous in amount since "they are predicated on a finally determined tax (including deficiency) rather than upon the tax shown on the return *200 which should have been used." In support of their position petitioners cite a ruling of respondent, unpublished by him, but reported by Commerce Clearing House at 443. This ruling, as reported by, states that for the purpose of determining whether there was a substantial underestimate of estimated tax within the meaning of section 294(a)(5), the total income and victory tax as shown on the return as filed should be used as the basis, rather than such total tax as finally determined. Subsections (a)(3), (4), and (5) were added to section 294 by the Current Tax Payment Act of 1943. Section 118 (a) of the Revenue Act of 1943 struck out subsections (a)(3), (4), and (5) and added section 294(d) (section 294(d)(1)(A), (B) and section 294(d)(2)), which was similar to the deleted subsections. S. Rept. No. 627, 78th Cong., 1st Sess. (1943) p. 47, comments on the change as follows: "This section, for which there is no corresponding provision in the House bill, amends section 294 of the Internal Revenue Code (relating to additions to the tax in case of nonpayment) by striking out subsection (a)(3), (4), and (5), containing provisions with respect to the estimated tax, and inserting subsection *201 (d), also relating to the estimated tax. Rearrangement is made in the interest of clarity so that the term "the tax" as used in section 294(d) (which is the tax imposed by chapter 1 of the Internal Revenue Code after credits for tax withheld at source) may not be confused with the expression 'tax shown on return.'" T.D. 5403, 1944 C.B. 349, which amended Regulations 111, section 29.294-1 to conform to the changes wrought by section 118 refers to the tax as the "tax imposed by chapter 1" rather than the tax shown on the return. The ruling relied upon by petitioners was issued prior to T.D. 5403 and would, even if reliable, be superseded by it. T.D. 5448, 1945 C.B. 256 which provides "the additions to the tax for failure to file a declaration of estimated tax within the time prescribed, or for underestimate of the estimated tax, shall be computed upon the basis of the tax shown on the return or the tax as finally determined, whichever is the lesser," is also of no help to petitioners since it applies only "to taxable years beginning before September 1, 1944." (Italics added.) We have previously approved without question additions computed on the basis of the tax as finally determined. *202 See DeWitt M. Sherwood, (1953) 20 T.C. 733. We think that is the mandate of the code and regulations. The respondent's determinations regarding Issue 4, except for the changes in the amounts due to our holding on Issue 3, are, therefore, upheld. Decisions will be entered under Rule 50. Footnotes
1. The following proceedings are consolidated herewith: The Home Sales Company "A" Docket No. 55127, and Theodore Julio and Anna Julio, Docket No. 55128.↩
2. All section references are to the Internal Revenue Code of 1939, as amended.↩
3. Home Sales also charged and accrued on its books as compensation for Anna, $2,149.99 and $2,150 for the fiscal years ended June 30, 1950 and June 30, 1951, respectively. The respondent has allowed these amounts as deductions in their entirety. ↩
4. The amounts charged on the books of Home Sales "A" were not designated "Compensation" as were the amounts charged on the books of Home Sales.↩
1. Of the $31,636.90, $31,407.90 was charged as compensation to Theodore and the balance of $229 was charged to direct labor. ↩
2. Of the $28,757.30, $28,351.30 was charged as compensation to Carl and the balance of $406 was charged to direct labor. ↩
3. The deficiency notice shows the amount deducted as $10,420.70. Paragraph 4 of the Stipulation of Facts shows the amount charged as compensation to Edward as $10,422.70. The discrepancy of $2.00 is unexplained in the record. ↩